## LORD v. LOCKE.

One who is not a party to a judgment, or against whom it cannot be enforced, is not permitted to use it for his own benefit, or to the disadvantage of his adversary.

The record of the proceedings before the justices on an application to take the poor debtor's oath is not admissible in a suit involving the validity of a prior sale of personal property by the debtor, between the vendee who was not a party to the poor debtor proceedings and an attaching creditor.

It is no objection to the validity of an alias capias execution that the debtor has given bond to take the poor debtor's oath within a year.

TRESPASS, for taking four cows. Facts found by a referee. February 24, 1881, the Merchants' National Bank of Lowell, Mass., recovered a judgment against Charles Lord, the plaintiff's father. Execution issued returnable on the first Tuesday of April, 1881. The execution, with an affidavit on the back, that the debtor concealed his property so that no attachment or levy could be made, was placed in the hands of the defendant, Locke, a deputy sheriff, who arrested the debtor thereon March 26. On the same day he was released upon giving bond as provided in *c.* 240 of Gen. Laws. March 7, 1882, he applied to justices appointed by the court to be admitted to take the poor debtor's oath. The bank resisted his application, upon the ground, among others, that his conveyances of his real and personal property were fraudulent as to creditors; but the justices admitted him to take the oath, and he took it March 24, 1882.

December 26, 1878, Lord conveyed to the plaintiff his farm,

except his homestead right and his wife's right of dower, which were excepted in the deed, and paid him $30 in cash.   The consideration for this conveyance was the plaintiff's labor on his farm six years from the time he arrived at the age of twenty-one to the time of the conveyance.   Lord's personal property consisted, principally, of five cows, two horses, some hay and other farm products, and a few other articles.   On the same day, and immediately after the conveyance of the real estate, he gave the plaintiff a bill of sale of the four cows in controversy, and such other, personal estate as they understood was liable to attachment, and retained such part as they understood was exempt.   They made no separation of the property sold from that retained.   The stock was kept in the barns as before, and all fed from the common fodder.   The general management of the real and personal estate continued to be exercised by the plaintiff as it had been for some time prior to the conveyance, and his father has not claimed the right to interfere.   The plaintiff and his parents have lived on the farm as one family, getting more or less of their support from the farm and stock.   For the personal property embraced in the bill of sale the plaintiff gave his father his promissory note for $212.50, payable in two years.   Both understood the plaintiff would not be called upon to pay the note.   A few days afterwards the plaintiff's brother bought the note of his father for $50 cash, and gave it to the plaintiff, who destroyed it.   The brother has since made the homestead place his home, agreeably to an understanding with the plaintiff and his father at the time the bill of sale was delivered and the note purchased.

November 11, 1881, the bank took out an alias execution, and placed it in the hands of Locke as deputy sheriff.   March 30, 1882, Locke took the four cows in controversy on the execution, advertised them for sale, and, April 8, attempted to sell them. The plaintiff forbade the sale, and threatened litigation if they were sold.   No bids could be obtained except a nominal one from a person present for the bank, although others were present to buy. The cows were struck off to the bank for the nominal price bid.

The plaintiff offered the record and proceedings before the justices who heard the application of Charles to be admitted to take the poor debtor's oath, and claimed that they were a judgment by which the bank is estopped from questioning the validity of the conveyances of December 26, 1878.   The evidence was excluded, and the plaintiff excepted.

The plaintiff contended that the sale of April 8 being for a nominal price was not such a sale as would justify the defendant in holding the cows against him.   The defendant contended that the sale was sufficient, since the plaintiff's conduct prevented him from getting bids from other parties.

The plaintiff also contended that the alias execution was irregularly issued, having been issued while the debtor's bond was sub-

sisting, and that action under it would not justify the defendant, at least as against the plaintiff; also, because the execution was a capias.

*Gould & Martin*, for the plaintiff.

*Chase & Streeter*, for the defendant.

CLARK, J. The facts reported fully warrant the finding of the referee that the sale of the personal property of Charles Lord to the plaintiff, on December 26, 1878, under which the plaintiff claims, was not a valid sale as against subsisting creditors, not only from want of a change of possession of the property, but also by reason of actual fraud, in being intended to hinder, delay, and defeat the creditors of Charles Lord.

The record and proceedings before the justices, on the application of Charles Lord to take the oath for the relief of poor debtors, were neither an estoppel nor were they competent evidence in this case. The plaintiff was a stranger to those proceedings. He was neither a party nor a privy in estate to the judgment of the justices. He claims title to the property in controversy from Charles Lord prior to that judgment, and consequently he is not bound by it; and as he is not bound by it the adverse party is not bound, and there is no estoppel, because estoppels must be mutual. *Hunt* v. *Haven*, 52 N. H. 162; *Chamberlain* v. *Carlisle*, 26 N. H. 540.

The alias capias execution was legally and properly issued. The first execution upon which the arrest had been made had been duly returned and was no longer operative, and in case the debtor failed to take the oath and surrendered himself at the jail at the expiration of the year, the alias execution would be necessary for his detention. *Woodham* v. *Chase*, 47 N. H. 58. Under our statute the creditor may pursue the person of the debtor and his estate at the same time. " Whenever a debtor is committed to prison on execution, the creditor, on the return thereof, may have a further execution against the property of the debtor, notwithstanding the debtor is not discharged; and upon the satisfaction of such execution the debtor shall be discharged." G. L., *c.* 235, *s.* 11. Upon taking the oath for the relief of poor debtors, on March 24, 1882, the person of the debtor became forever after exempt from arrest or imprisonment on that debt, but his estate still remained liable for the same. G. L., *c.* 241, *s.* 11. The capias execution, legally issued on November 11, 1881, against both the person and the estate of the debtor, still remained in force. It had never been levied nor used; and the fact that the person of the debtor had become exempt from arrest did not destroy its efficiency as against his goods and estate. *Perley*, J., in *Chadbourn* v. *Bank*, 24 N. H. 333. The execution being a sufficient justification for taking the

property, was a sufficient justification for its detention and sale, although the sale was after the return day of the execution. Freem. Ex., *s.* 106.

As the plaintiff is not entitled to damages, the price at which the property sold on execution is immaterial. If it was material, it might be a pertinent inquiry whether the plaintiff is in a position to complain of the inadequacy of price resulting from his own interference with the sale.

*Judgment for the defendant.*

ALLEN, J., did not sit: the others concurred.